IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

CHARLES SCHLEGEL,

    Plaintiff,                                              No. CIV 07-0520 MCE KJM

    vs.

KAISER FOUNDATION HEALTH PLAN, et al.,

    Defendants.                                    <u>ORDER</u>

_____/

        Plaintiff's motion to compel production of documents came on regularly for hearing July 16, 2008. Stuart Talley appeared for plaintiff. Ronald Lamb appeared for defendants. Upon review of the documents in support and opposition as well as supplemental briefing, upon hearing the arguments of counsel, and good cause appearing therefor, THE COURT FINDS AND ORDERS AS FOLLOWS:

I. <u>Plaintiff's Allegations</u>

        Plaintiff alleges that in 2001, he enrolled in Kaiser's health plan through an individual policy. Joint Statement (JS) at 2:21-22. He was enrolled in that plan until December 2005, when plaintiff obtained Kaiser coverage through his employer, Vacaville Towing Group. Pl.'s Opp'n to Def't's MTD at 1:10. Plaintiff was diagnosed with kidney problems in June 2003 and was informed that a kidney transplant was necessary. JS at 2:22-26. At that time, Kaiser did

1

not operate a kidney transplant program so plaintiff was referred to U.C. Davis Medical Center where he was placed on the national kidney transplant list. Id.

In June 2004, Kaiser opened its own kidney transplant center and informed its members to remove themselves from the national transplant lists and enroll in Kaiser's program. Id. at 3:1-3. As a result, plaintiff and 1,500 other patients were transferred to Kaiser's program, making Kaiser's transplant list one of the largest in the country. Id. In the process of the transfer, some patients lost time on the national transplant list, some were denied available kidneys, and some passed away. Id.

As a result of problems with the program, Kaiser closed its transplant center in May 2006 and sent its patients back to outside transplant centers. Id. at 3:6-7. Shortly thereafter, investigations were conducted by California's Department of Managed Health Care ("DMHC"), the Federal Department of Health and Human Services Centers for Medicare and Medicaid Services ("CMS"), and the United Network for Organ Sharing ("UNOS"). Id. at 3:18-21. Following its investigation, DMHC issued a report finding numerous violations of state law, which resulted in a $5 million fine for Kaiser. Id. at 3:22-26. Upon further investigation of complaints made by Kaiser patients regarding the program and its peer review process, DMHC issued another report and another $3 million fine. Id. at 4:1-3.

Following its investigations, CMS issued a report that made reference to documents generated by two Kaiser peer review committees, The Quality Utilization and Oversight Committee and the Quality Health Improvement Committee. Id. at 4:5-11. The report cited Kaiser for violating fifteen federal regulations governing the conduct of transplant centers. Id.

UNOS did not make its report public, but issued a press release stating that it conducted an investigation through which it determined Kaiser was a "member not in good standing." Id. at 4:12-14.

/////

II. <u>Procedural History</u>

On February 9, 2007, plaintiff filed suit against defendants in state court, alleging claims for breach of the duty of good faith and fair dealing, breach of contract, negligence, fraud, negligent misrepresentation, and intentional and negligent infliction of emotional distress. On March 15, 2007, defendants removed the case to federal court based on ERISA presumption.

Plaintiff's pending motion to compel seeks documents relating to the overall operation of Kaiser's transplant program, including documents relating to any investigation and audits of the transplant center by Kaiser, DMHS, CMS and UNOS. Defendants object to production of these documents, asserting they are protected by the peer review privilege and the "self-critical" analysis privilege. <u>Id.</u> Specifically, defendants assert the state law peer review privilege found in California Evidence Code § 1157 should apply and that Congress created a broad peer review privilege when it enacted the 2005 Patient Safety and Quality Improvement Act.

III. <u>Jurisdiction</u>

At hearing, defendants contended this court should not resolve the current discovery dispute until after their motion to dismiss is resolved. On September 11, 2008, the district judge denied the motion to dismiss, eliminating any question with respect to this court's jurisdiction to resolve the pending dispute. Since the hearing, the district judge also has approved the parties' stipulation to extend discovery to October 15, 2008.

IV. <u>Peer Review Privilege</u>

   A. <u>ERISA Preemption</u>

Defendants removed this case to federal court asserting that "because plaintiff's claims relate to an employee benefit plan as described by section 4(a) of ERISA, 29 U.S.C. § 1003(a), which is not exempt by section 4(b) of ERISA, <u>id</u>. § 1003(b), they are preempted by 514(a) of ERISA, <u>id</u>. § 1144(a)." Removal Notice at 3:20-22. Section 514(a) states that provisions of ERISA "shall supersede any and all State laws insofar as they may now or hereafter

relate to any employee benefit plan" that is subject to ERISA.  29 U.S.C. § 1144(a).  As noted, defendants now assert that the state law peer review privilege found in California Evidence Code § 1157 should apply.  However, the general rule is that "privileges in federal cases are governed by federal law."  Fed. R. Evid. 501; <u>United States v. Zolin</u>, 491 U.S. 554, 564 (1989).  There is no exception applicable here.  The state peer review privilege is not applicable in this case.

    B.  <u>Federal Statutory Law</u>

Defendants also contend that the Patient Safety and Quality Improvement Act, enacted by Congress in 2005, created a broad federal peer review privilege.  The Act states, in pertinent part, that "patient safety work product shall be privileged and shall not be... subject to discovery in connection with a Federal, State, or local civil, criminal, or administrative proceeding... against a provider."  42 U.S.C. § 299b-22(a)(2).  Patient safety work product is defined, in pertinent part, as:

> [D]ata, reports, records, memoranda, analyses . . . , or written or oral statements which: (1) are assembled or developed by a provider for reporting to a patient safety organization and are reported to a patient safety organization; or (2) are developed by a patient safety organization for the conduct of patient safety activities; and which could result in improved patient safety, health care quality, or health care outcomes. . . .

42 U.S.C. § 299b-21(7)(A).

This statute carves out a narrow peer review privilege for work product prepared by a patient safety organization or prepared for, and reported to, a patient safety organization.  To qualify as a patient safety organization, the entity must submit certification to the Secretary of the Department of Health and Human Resources and must meet specific criteria.[1]  42 U.S.C. § 299b-

---

[1] The criteria for the initial certification as a patient safety organization include:

> (A) The mission and primary activity of the entity are to conduct activities that are to improve patient safety and the quality of health care delivery.
> (B) The entity has appropriately qualified staff (whether directly or through contract), including licensed or certified medical professionals.

4

24(a)–(b). A patient safety organization's "mission and primary activity" must be to "conduct activities [that] improve patient safety and the quality of health care delivery." Id. It is apparent that the unique and narrow privilege created by the Patient Safety Act was not intended to apply to the materials requested by plaintiff in discovery. There is no indication that the investigations conducted by Kaiser, UNOS, CMS and DMHC were prepared for and reported to a patient safety organization. Rather, each of those investigations resulted from Kaiser's decision to shut down its kidney transplant program. See JS at 3:18-19. None of these entities themselves is a patient safety organization. Additionally, there is no indication that the "mission and primary activity" of any of the relevant entities concerns the goal of patient safety as defined by the statute. Nothing defendants have provided supports a contrary conclusion.

      C. <u>Federal Common Law</u>

As mandated by the Federal Rules of Civil Procedure, "parties may obtain discovery regarding any non-privileged matter that is relevant to any party's claim or defense." Fed. Rule Civ. P. 26(b)(1). "Even if it may not be admissible at trial, [ ] evidence is discoverable if it appears reasonably calculated to lead to the discovery of admissible evidence." <u>Zoom Imaging, L.P. v. St. Luke's Hosp. and Health Network</u>, 513 F. Supp.2d 411, 413 (E.D. Pa. 2007).

/////
/////
/////

---

> (C) The entity... has bona fide contracts...with more than one provider for the purpose of receiving and reviewing patient safety work product.
> (D) The entity is not, and is not a component of, a health insurer (as defined in section 300gg-91(b)(2) of this title).
> ...
> (F) To the extent practical and appropriate, the entity collects patient safety work product from providers in a standardized manner that permits valid comparisons of similar cases among similar providers.

42 U.S.C. § 299b-24(b)(1).

5

Rule 501 of the Federal Rules of Evidence, which governs the existence of privileges in federal court, provides:

> [T]he privilege of a witness, person, government, State, or political subdivision thereof shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience. However, in civil actions and proceedings, with respect to an element of a claim or defense as to which State law supplies the rule of decision, the privilege of a witness, person, government, State, or political subdivision thereof shall be determined in accordance with State law.

To determine whether state law supplies the rule of decision, courts look to whether the state law provides the source of the right sued upon. Here, plaintiff's claims relate to an employee benefit plan as described in section 4(a) of ERISA, and defendants' removal of the action from state court is premised on ERISA's superseding any state law insofar as it relates to an employee benefit plan. Accordingly, federal law provides the source of the right sued upon. Moreover, plaintiff's claims arising before the time he began to be covered by ERISA, as supplemental state law claims, are governed by federal privilege law. Burrows v. Redbud Community Hosp. Dist., 187 F.R.D. 606, 611 (N.D.Cal.1998).

Although federal courts are not required to apply state privileges, the court may do so as a matter of comity. Id. at 608 (citing Kelly v. City of San Jose, 114 F.R.D. 653, 656 (N.D.Cal.1987)). If the state law is not inconsistent with federal law, "the federal court should attempt to apply the state privilege in harmony with federal privileges law." Id. at 609. The California Evidence Code states in pertinent part that, "[n]either the proceedings nor the records . . . of a peer review body . . . having the responsibility of evaluation and improvement of the quality of care rendered in the hospital . . . shall be subject to discovery." Cal. Evid. Code § 1157(a). The absolute bar on discovery under section 1157 is in conflict with the liberal policy of discovery inherent in the Federal Rules. Leon v. County of San Diego, 202 F.R.D. 631, 635-36 (S.D.Cal. 2001).

/////

Moreover, this state law privilege appears to be in conflict with federal common law. As one court observed recently, "[t]he Supreme Court has never recognized a federal medical peer review privilege and there are no circuit court cases recognizing such a privilege." Jenkins v. DeKalb County, Georgia, 242 F.R.D. 652, 655 (N.D. Ga. 2007). The Ninth Circuit specifically, in Agster v. Maricopa County, 422 F.3d 836, 839 (9th Cir. 2005), has explained it is not bound by the state's peer review privilege; rather it expressed great reluctance "to recognize a privilege in an area where it appears that Congress has considered the relevant competing concerns but has not provided the privilege itself." Id. (citing Univ. of Pennsylvania v. EEOC, 493 U.S. 182, 189 (1990)). Here, where Congress had the opportunity to provide a broad peer review privilege when it enacted 42 U.S.C. § 299b, it did not do so; rather it carved out a limited exception to which the privilege would apply.

Defendants contend that Agster is distinguishable because it involved medical care in a county jail. JS at 14:5-17. In Agster, the Ninth Circuit explained that discoverability of information is peculiarly important when there are competing goals affecting the care offered, and noted the competing interests in the case of jails because "safety and efficiency of the prison may operate as goals affecting the care offered." Agster, 422 F.3d at 836. A conflict in goals, however, is not limited to the prison context. In this case, Kaiser was attempting to build a new program in an area it had historically left to outside transplant centers. Overnight, Kaiser's transplant list become one of the largest in the country. The goal of building a new program is potentially in conflict with Kaiser's need to establish an efficient and effective program to meet the demand for kidney transplants. Indeed, the reports produced by DMHC, CMS and UNOS conclude that Kaiser did not resolve these tensions appropriately.

In Agster, the Ninth Circuit also addressed the concern raised by defendants here, that peer reviews would be chilled if a privilege was not recognized. The court noted that "public accountability" demands would likely guarantee the peer review process would continue and not be jeopardized. Agster, 422 F.3d at 839.

When a privilege is asserted that does not exist "in the common law but [is] enacted by the (state) legislature based on the unique considerations of government policy . . . courts [must] balanc[e] the policies behind the privilege against the policies favoring disclosure." Jenkins, 242 F.R.D. at 656 (quoting ACLU v. Finch, 638 F.2d 1336, 1345 (5th Cir. 1981)). The competing policy concerns have been identified through four factors to guide "how to determine whether an evidentiary privilege should be created." Adkins v. Christie, 488 F.3d 1324, 1328 (11th Cir. 2007) (citing Jaffee v. Redmond, 518 U.S. 1, 10-16 (1996)), cert. denied, __ U.S. __, 128 S. Ct. 903 (2008). The four factors are: (1) the needs of the public good, (2) whether the privilege is rooted in the imperative need for confidence and trust, (3) the evidentiary benefit of the denial of the privilege, and (4) consensus among the states. Id.

In addressing the first factor–the needs of the public good–the Adkins court opined that a peer review privilege promotes vigorous oversight of physician performance, which in turn leads to a greater chance that physician performance standards are upheld. Id. The vigor of the oversight process may be enhanced by a peer review privilege, without which reviewing physicians are less inclined to be candid. However, if peer reviews are kept from the public, the value of the exercise and the resulting public accountability is undermined. Because there are other ways to encourage candor, such as anonymous reviews, this factor cuts against creating a federal peer review privilege.

In addressing the second factor–whether the privilege is rooted in the imperative need for confidence and trust–the Adkins court noted while there is a legitimate interest in keeping certain documents confidential, the district court retains the ability to protect documents through protective orders, confidentiality agreements, and, when appropriate, by disclosure only following in-camera review. Id. Here, although it does not appear the parties have agreed on a protective order to govern the discovery phase of litigation, nothing stands in the way of their reaching such an agreement.

/////

The third factor–evidentiary benefit of the denial of the privilege–almost always points in favor of denying the privilege.  In Adkins, the court found the only way the plaintiff in that case would be able to demonstrate a meritorious claim would be by comparing peer reviewed documents with each other.  In this case, while there may be other methods to discover relevant information–such as through depositions of the physicians who took part in the peer reviews–if the materials are privileged, then the substance of the peer review will be privileged as well.  Thus, as in Adkins, there is an evidentiary benefit in the denial of the privilege.

The fourth factor–consensus among the states–weighs in favor of recognition of the peer review privilege in federal court because the peer review privilege has been recognized in all fifty states and the District of Columbia.  Id. at 1330.

Upon considering these factors the court finds the balance weighs in favor of disclosure in this action.

V.  "Self-Critical" Analysis Privilege

The "self-critical" analysis privilege also invoked by defendants has not been recognized by the Ninth Circuit.  Union Pacific R. Co. v. Mower, 219 F.3d 1069, 1076 n.7 (9th Cir. 2000).  In addition, it does not appear that California has recognized such a privilege.  Cloud v. Superior Court, 50 Cal.App.4th 1552, 1559 (Cal.App.4th 1996) (13 privileges recognized in the California Evidence Code, the self-critical analysis privilege not among them).  In any event, the privilege would be inapplicable to this case because the four elements of the "self-critical" analysis privilege are not met.  First, the information must result from a critical self-analysis undertaken by the party seeking protection.  Dowling v. American Hawaii Cruises, 971 F.2d 423, 426 (9th Cir. 1992).  Second, the public must have a strong interest in preserving the free flow of the type of information sought.  Id.  Third, the information must be of the type whose flow would be curtailed if discovery were allowed.  Id.  Finally, in order for the privilege to apply, the document must be prepared with the expectation that it would be kept confidential, and has in fact been kept confidential.  Id.

The first element of the privilege, requiring a self analysis is not satisfied by any of the documents created by UNOS, CMS and DMHC, as they all are entities separate from Kaiser.

With respect to documents created by Kaiser, the first element is satisfied, as is the second element, because there is a strong interest in preserving the free flow of information for investigating administrative problems regarding failed kidney transplant programs.  It is not clear that the third element is met, and nothing in the record supports a conclusion that this information will be curtailed if discovery is allowed.  With respect to the fourth factor, given the liberality of federal discovery, the lack of broad protection as discussed above, and the lack of an established "self-critical" privilege in both federal and state courts, it would not have been reasonable for defendants to have an expectation of confidentiality.  The elements of a federal "self-critical" analysis privilege have not been satisfied.

VI. Conclusion

In light of the above, the motion to compel documents relating to the overall operation of Kaiser's transplant program should be granted.

Accordingly, IT IS HEREBY ORDERED that plaintiff's motion to compel is granted.  Documents responsive to requests for production of documents, as enumerated in the joint discovery statement, shall be produced, for copying and inspection, within ten days.

DATED: October 10, 2008.

U.S. MAGISTRATE JUDGE